**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

SEP 2 1 2016

NICHOLAS YOUNG,                )
                               )
        Petitioner,            )
                               )
            v.                 )   Case No.: 1:16CV1202
                               )
DANA LAWHORNE, SHERIFF         )   *EXPEDITED* PETITION FOR A WRIT OF
ALEXANDRIA DETENTION CENTER    )   HABEAS CORPUS
ALEXANDRIA, VIRGINIA,          )
DESMOND R. PROCTOR, ACTING     )
SUPERVISORY DEPUTY U.S. MARSHAL.)

**TO THE HONORABLE UNITED STATES JUDGE:**

Petitioner, Nicholas Young, is currently confined in pretrial detention at the Alexandria

Detention Center in Alexandria, Virginia ("ADC"). Within a week of his arrest on August 3,

2016, Mr. Young was moved to solitary confinement in the ADC's administrative segregation

unit, where he remains today. Through undersigned counsel, and pursuant to the United States

Constitution and 28 U.S.C. § 2241, Mr. Young petitions this Court to consider this Petition on an

expedited basis, and to issue a Writ of Habeas Corpus ordering his release from his current,

unconstitutional conditions of punitive pretrial confinement, under which he:

- Is secluded in solitary confinement 22 hours per day in a cell approximately 8 by 8 feet;

- Has lost seven to ten pounds in weight;

- Has been denied access to an insomnia medication on which he has for years relied to sleep at night and without explanation, medical or otherwise;

- Is suffering from depression, of which he has a long history, and from a broader acute deterioration in mental health and well-being brought on by constant isolation;

- Recently bit off a portion of a tooth while grinding his teeth in a paroxysm of stress, for which ADC deputies informed Mr. Young he could not expect to receive medical assistance for several days;

1

- Has informed undersigned counsel that he "could see himself dying soon in isolation";

- May receive 30-minute visits from family members only under unduly restrictive conditions;

- Is apparently the only detainee currently held in solitary confinement not charged with, and without a history of, violence;

- Is subject to seemingly arbitrary deprivations (some of which have been reversed under pressure from counsel and family members), such as being denied access to the book cart, and from participating in ADC inmate programs, including those based on religious observance.

The two grounds which have been cited by ADC personnel in support of isolating Mr. Young in administrative segregation are that he: (1) is a former police officer with the Washington D.C. Metropolitan Transit Authority (WMTA); and (2) has been charged with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. The material-support-for-terrorism charge consists of Mr. Young's alleged attempt to provide $245 in Google Play gift cards to an undercover FBI agent, posing as his friend, who had pretended to travel to the Middle East to join the Islamic State of Iraq and the Levant ("ISIL"). *See United States v. Nicholas Young*, 16-mj-355 (E.D. Va. 2016), ECF 2.

However, on September 15, 2016, Sheriff Lawhorne of the ADC has clarified to undersigned counsel that (1) Mr. Young is being held in 22-hour-a-day isolation "for his own safety"; (2) notwithstanding the deleterious effects of constant isolation on Mr. Young's health and well-being, Mr. Young will not be moved to the general population unless and until the press coverage of Mr. Young's case diminishes; (3) the dispositive distinction between Mr. Young and other ADC pretrial detainees charged with the same material-support-for-terrorism crime but who have not been isolated in administrative segregation is that Mr. Young's case has garnered more publicity; and (4) even though Mr. Young is putatively held in solitary confinement for his

2

own benefit (and not because he poses a threat to other inmates), the ADC will not accept (a) a blanket legal waiver from Mr. Young releasing the ADC and its officials from any legal liability related to, involved in, or connected with moving Mr. Young out of isolation to the general population; and (b) an indemnification of the ADC and its officials as a backstop to any actionable damages that are somehow found to exist notwithstanding the aforementioned legal waiver.

Mr. Young's case involves extensive discovery including at least 30-40 hours of recorded conversations, text communications, and emails, not to mention an intensive security clearance process for undersigned counsel that can consume months. Undersigned counsel must review all of these materials, some of which are classified and many of which have yet to be produced, to effectively advise Mr. Young of his rights and the strength of his potential defenses. Indeed, the Assistant United States Attorney assigned to the case, Gordon Kromberg, has made clear that the United States Attorney's Office does not take the position that Mr. Young should be held in solitary confinement. Yet, the ADC's placement of Mr. Young in nearly-constant isolation has significantly weakened his ability to work with counsel, focus on his case, and overcome the well-known psychological pressures of solitary throughout a months-long discovery process.

Against that backdrop, the ADC's restrictions on Mr. Young cannot be considered "reasonably related" to "a legitimate governmental objective" and indeed encroach on his trial rights and due process right not to be punished in pretrial detainment. *See Bell v. Wolfish*, 441 U.S. 520, 535-36, 99 S. Ct. 1861 (1979); *see also David H. Brooks* v. *Duke Terrell*, *Warden, Met. Det. Ctr.*, 10-cv-4009, 2010 U.S. Dist. LEXIS 144781 (E.D.N.Y. Oct. 14, 2010) (ordering move from administrative segregation to general population, pursuant to 28 U.S.C. § 2241); *United States v. Basciano*, 369 F. Supp. 2d 344 (E.D.N.Y. 2005) (same). In addition, the ADC's

restrictions on Mr. Young flout the notice, hearing, and health-related protections built into 28

C.F.R. § 541.22 *et seq.* Accordingly, the Court should grant the writ and order that Mr. Young

be released to the general population of the jail.

**A.   JURISDICTION**

1.     This Court has personal and subject matter jurisdiction pursuant to 28 U.S.C. §

2241(c) because Mr. Young is in custody in this district under or by color of authority of the

United States and because his current custody violates the Constitution and laws of the United

States.

**B.   BACKGROUND**

2.     On August 3, 2016, the government arrested Petitioner Young, and filed a

criminal complaint alleging that he had attempted to provide material support and resources to a

designated foreign terrorist organization ("FTO"), in violation of 18 U.S.C. § 2339B. *United*

*States v. Nicholas Young*, 16-mj-355 (E.D. Va. 2016), ECF 1, p. 1.

3.     According to the affidavit filed in support of the complaint, Mr. Young's alleged

attempt to aid an FTO was committed when he allegedly acquired approximately $245 in Google

Play "gift cards"[1] and provided the cards' activation codes to a person he believed was a Muslim

friend, Mohammad, who Mr. Young was led to believe had recently joined the Islamic State of

Iraq and the Levant ("ISIL") in Syria. *Young*, 16-mj-355, ECF 2, pp. 14-16. The person

believed by Mr. Young to be Mohammad had previously requested the gift cards from Mr.

Young. *Id.* "Mohammad" was in fact an undercover FBI "confidential human source" who had

cultivated Mr. Young's friendship for over two years, together with other government agents

who had insinuated themselves into Mr. Young's life. *Id.*, pp. 7-16.

---

[1] A "Google Play" card is a digital gift card made available by the internet company Google, with which the card's holder may redeem "the latest apps, games, music movies and more," but not cash. *See* https://play.google.com/store/gift?hl=en.

4.      Now thirty-six years old, Mr. Young was raised in Fairfax, Virginia, attending West Potomac High School.  Prior to his arrest, he served for over thirteen years as a police officer with the Washington Metropolitan Transportation Authority (the "WMTA").  *Young*, 16-mj-355, ECF 2, p. 3.

5.      Before the criminal complaint was filed in this case Mr. Young never had been arrested for, charged with, or convicted of, a crime.  Indeed, the press has reported that, while investigating Mr. Young, the F.B.I. instructed the WMTA, which had been tipped off about the terrorism investigation, to permit Mr. Young to *remain on the force*.  *See* Police Officer for D.C. Subway System Accused of Trying to Help ISIS, Washington Post, Aug. 3, 2016, available at http://wapo.st/2aPWdUx.

6.      Before arresting him for the alleged distribution of Google Play gift cards, the government had been monitoring, following, and inserting undercover agents into the life of Mr. Young for nearly six years.  *Young*, 16-mj-355, ECF 2, p. 3.  The investigation may have begun in or around September 2010, when the FBI interviewed him in reference to the arrest of Zachary Chesser, whom the government labels Mr. Young's "acquaintance,"[2] and who had been arrested earlier in 2010 for attempting to provide material support to al-Shabaab, another FTO.  *Id.*  As the affidavit in support of the complaint acknowledges, Mr. Young stated at the time that he was "shocked by the charges [against Chesser]," and declared that it would be his "religious and personal duty to tell someone if Young became aware of terrorist activity." *Id.*

7.      Nevertheless, for the next six years, no fewer than three undercover F.B.I. agents and confidential human sources ("CHS") were introduced into Mr. Young's life.  *Young*, 16-mj-355, ECF 2, pp. 3-16.

---

[2] Mr. Young objects to the application of this term to an association that, according to Mr. Young, consisted of no more than two chance encounters at a Virginia mosque which both Messrs. Chesser and Young attended.

8. The affidavit in support of the complaint alleges approximately six seemingly dangerous comments Mr. Young made to these undercover agents and CHS, picked from a span of over six years. *Young*, 16-mj-355, ECF 2, pp. 3-5. They allege that Mr. Young: once held a rifle out of his window to "scan" for surveillance; vowed to take violent countermeasures if he was ever "betrayed by someone"; "used to torture animals when he was a child"; wondered at the security gaps at the federal courthouse in Alexandria; spoke about the "fundamentals of marksmanship"; and "spoke about" locating the residence of the F.B.I. Special Agent who had interviewed him and exacting revenge. *Id.*

9. Mr. Young offers the following responses to these specific allegations. First, some of the allegations are incorrect or misleadingly exaggerated. Mr. Young never told the individual identified in the affidavit in support of the complaint as "UCO" that Mr. Young "used to torture animals when he was a child." *Young*, 16-mj-355, ECF 2, p. 4. Instead, in a wide-ranging conversation with "UCO" – who had cultivated Mr. Young's friendship the better to expose him to legal jeopardy – Mr. Young drew a comparison that referenced the childhood game of focusing light on ants through a magnifying glass. Yet, in the complaint, this is characterized as Mr. Young "tortur[ing] animals when he was a child." *Id.*

10. Second, some of the remarks attributed to Mr. Young are stripped of conversational context. What the affidavit in support of the complaint omits to disclose is that when Mr. Young spoke of traitors finding themselves "at the bottom of Lake Braddock," or of exacting revenge from an F.B.I. Special Agent, he was speaking in a tongue-in-cheek, black humor style. The government itself partly acknowledges this. After relating Mr. Young's alleged comment concerning exacting revenge on an F.B.I. Special Agent, the affidavit in

support of the complaint adds: "UCO reported that UCO doubted that Young seriously intended to act upon those words." *Young*, 16-mj-355, ECF 2, p. 5.

11.     For all the suggestions of violence surrounding these alleged comments, several facts acknowledged by the government must be borne in mind.  Throughout the years-long investigation into Mr. Young, the government not only permitted him to remain on the police force but reportedly instructed the WMTA expressly to keep him employed there as the investigation proceeded.  See Police Officer for D.C. Subway System Accused of Trying to Help ISIS, WASHINGTON POST, Aug. 3, 2016, available at http://wapo.st/2aPWdUx.  The decision to maintain Mr. Young in his position as the investigation proceeded speaks as loudly as the anecdotes offered in the criminal complaint concerning the danger he poses.

12.     Nor is there any allegation or suggestion that Mr. Young intended to commit, or aid the commission of, acts of violence perpetrated by ISIL or any other FTO.  The sole criminal act alleged in the complaint is the delivery of Google Play gift cards to an undercover FBI agent posing as Mr. Young's friend.  *Young*, 16-mj-355, ECF 2, pp. 14-16.

13.     Within a week of Mr. Young's arrest on August 3, 2016, he was moved to solitary confinement in the ADC's administrative segregation unit, where he remains today.

14.     In the administrative segregation unit, Mr. Young is held in complete isolation twenty-two hours a day, seven days a week, in a cell approximately eight feet by eight feet.  In insolation:

15.     Mr. Young has lost seven to ten pounds in weight.

16.     Mr. Young has been denied access to a prescribed insomnia medication on which he has for years relied to sleep at night and without explanation, medical or otherwise.

17.     Mr. Young is suffering from depression, of which he has a long history, and from a broader acute deterioration in mental health and well-being brought on by constant isolation.

18.     Mr. Young recently bit off a portion of a tooth while grinding his teeth in a paroxysm of stress, for which ADC deputies informed Mr. Young he could not expect to receive medical assistance for several days.

19.     Mr. Young has informed undersigned counsel that he "could see himself dying soon in isolation."

20.     Mr. Young is apparently the only detainee currently held in solitary confinement in the ADC not charged with, and without a history of, violence.

21.     Mr. Young has been subject to seemingly arbitrary deprivations (some of which have been reversed under pressure from counsel and family members), such as being denied access to the book cart, and from participating in ADC inmate programs, including those based on religious observance.

22.     ADC personnel orally informed Mr. Young's family and undersigned counsel that Mr. Young had been placed in administrative segregation for two independently sufficient reasons: (a) he is a former police officer with the WMTA, and must be segregated for his own protection; and (b) he has been charged with material support for terrorism.

23.     The Assistant United States Attorney assigned to Mr. Young's criminal case, Gordon Kromberg, has indicated that the United States Attorney's Office does not take the position that Mr. Young should be held in administrative segregation.

24.     On September 6, 2016, undersigned counsel delivered a letter to the Sheriff of the ADC, Dana Lawhorne. *See* Ltr. to Dana Lawhorne from Nicholas D. Smith, dated September 6, 2016, attached hereto as Exhibit 1.  The letter noted that Mr. Young's mental health was

deteriorating in solitary confinement, that his well-being would significantly improve through a move to the general population and out of constant isolation, and that he had never been accused of any crime of violence, inclusive of the pending material support for terrorism charge. *Id.*

25.     The letter requested that the Sheriff reconsider Mr. Young's placement in solitary confinement, and failing such a change, that the Sheriff promptly notify undersigned counsel in writing: (a) as to the reasons why the ADC will not relocate Mr. Young to the general inmate population with any supporting factual foundation for the same, as well as the process by which an appeal of the Sheriff's decision may be exhausted; (b) when, how often, and in what manner the ADC will periodically review Mr. Young's placement in administrative segregation, in accordance with 28 C.F.R. § 541.22 and/or other regulatory or statutory authority; and (c) whether the ADC will promptly permit Mr. Young to receive his previously prescribed insomnia medication, and participate in ADC inmate programs, including those based on religious observance, and if not, the supporting reasons. Exh. 1.

26.     Later that day, Sheriff Lawhorne responded by email to undersigned counsel. The Sheriff stated that Mr. Young's custody status had "been reviewed by all levels and we consider it the appropriate classification." However, the Sheriff added that he would convene a meeting the following morning to discuss undersigned counsel's concerns about Mr. Young's health and well-being.

27.     On September 11, 2016, not having heard back from the Sheriff, undersigned counsel sent a follow-up email to him. Undersigned counsel requested that the Sheriff provide an update on Mr. Young's request to be moved to the general inmate population. Undersigned counsel also noted that their meetings and conversations with Mr. Young that week and over the weekend had sharpened their concerns about his mental health and well-being; and that Mr.

Young has a long history of depression, which could explain why solitary confinement has had such an acutely negative effect on his mental state, growing worse by the day. Undersigned counsel informed the Sheriff of the extensive discovery involved in Mr. Young's case, as well as the security clearance process for his counsel that must be completed before they can even begin to review classified government materials. Given those realities, undersigned counsel observed, there is a real risk that the mental pressures of solitary confinement could coerce Mr. Young into pleading guilty to charges to which may have meritorious defenses.

28.     On September 15 and 16, 2016 undersigned counsel received a phone call, and follow up email, from Sheriff Lawhorne, which clarified the following: (1) Mr. Young is being held in 22-hour-a-day isolation "for his own safety"; (2) notwithstanding the deleterious effects of constant isolation on Mr. Young's health and well-being, Mr. Young will not be moved to the general population unless and until the press coverage of Mr. Young's case diminishes; (3) the dispositive distinction between Mr. Young and other ADC pretrial detainees charged with the same material-support-for-terrorism crime but who have not been isolated in administrative segregation is that Mr. Young's case has garnered more publicity; and (4) even though Mr. Young is putatively held in solitary confinement for his own benefit (and not because he poses a threat to other inmates), the ADC will not accept (a) a blanket legal waiver from Mr. Young releasing the ADC and its officials from any legal liability related to, involved in, or connected with moving Mr. Young out of isolation to the general population; and (b) an indemnification of the ADC and its officials as a backstop to any actionable damages that are somehow found to exist notwithstanding the aforementioned legal waiver.

29.     During the September 15, 2016 phone call, the Sheriff informed undersigned counsel that he does not believe there is any administrative mechanism for appealing the Sheriff's final custody decisions.

30.     Over a week after delivering the letter to the Sheriff, on September 16, 2016, undersigned counsel received a written response from the U.S. Marshals Service to the aforementioned September 6 letter. *See* Ltr. to Nicholas Smith from Desmond R. Proctor, Acting Supervisory Deputy U.S. Marshal, attached hereto as Exhibit 2.  In summary, the September 16 letter stated that the U.S. Marshals and ADC take "Mr. Young's mental and physical health very seriously"; that the USMS "fully supports the ADC's housing classification decision" for Mr. Young; that it is the USMS and ADC's responsibility and duty to determine what does, or does not, pose a security risk "to the general inmate population"; that "ADC will continue to review Mr. Young's housing classification status on a weekly basis and in accordance with ADC policy"; but that the USMS "*have determined that Mr. Young will remain classified to this housing status.*" *Id.* (emphasis added).

31.     Thus, there appears to be inconsistency between the accounts of the Sheriff and the U.S. Marshals as to why Mr. Young is held in administrative segregation.  During the September 15 call with undersigned counsel, the Sheriff indicated the driving concern was Mr. Young's own safety. *Supra*, para. 27.  Yet, the September 16 letter from the USMS suggests that the reason is "a security risk to the general inmate population." Exh. 2, p. 2.

32.     Although the information was requested by undersigned counsel in its September 6 letter, the September 16 letter from the USMS did not indicate how and whether Mr. Young's confinement in administrative segregation complied with 28 C.F.R. § 541.22 *et seq.*, which governs federal administrative detention.

33.    A detainee may properly be placed in administrative segregation when his "presence in the general population poses a threat to life, property, self, staff, other inmate, the public, or to the security or orderly running of the institution." 28 C.F.R. § 541.23(c). The September 16 letter from the USMS does not explain the factual foundation for the apparent belief that Mr. Young meets this standard. Mr. Young has never been accused of, charged with, or convicted of any crime before the instant material-support charge. In fact, the press has reported that the FBI instructed the WMTA to maintain Mr. Young on the police force for years while he was being investigated. *See* http://wapo.st/2aPWdUx. Mr. Young has agreed to waive all claims against the ADC and its officials in case of any harm that befalls him in the general population. The ADC and its officials were unwilling to discuss an indemnity backstop to such a waiver.

34.    Sheriff Lawhorne has indicated that Mr. Young is primarily, or solely, being held in administrative protection for his own benefit. *Supra*, para. 28. If so, then Mr. Young is classified under federal regulations as a "protection case." 28 C.F.R. § 541.27. A "protection case" may be placed in administrative segregation for the following reasons only: "(a) Victim of inmate assault or threats. You were the victim of an inmate assault, or are being threatened by other inmates, including threats of harm if you do not act in a certain way, for example, threats of harm unless you engage in sexual activity; (b) Inmate informant. Your safety is threatened because you provided, or are perceived as having provided, information to staff or law enforcement authorities regarding other inmates or persons in the community; (c) Inmate refusal to enter general population. You refuse to enter the general population because of alleged pressures or threats from unidentified inmates, or for no expressed reason; (d) Staff

concern. Based on evidence, staff believe your safety may be seriously jeopardized by placement in the general population." 28 C.F.R. § 541.27.

35.     On the evidence, Mr. Young does not even arguably satisfy any of the "protection case" categories except perhaps "staff concern." Yet, in that case, neither the ADC nor the USMS has explained how Mr. Young's "safety may be *seriously jeopardized* by placement in the general population." 28 C.F.R. § 541.27 (emphasis added).  Nor have they explained why a waiver and indemnification agreement would not overcome that sole regulatory factor cited in support.

36.     If a detainee is to be placed in administrative segregation, then he "will receive a copy of the administrative detention order, ordinarily within 24 hours, detailing the reason(s) for [his] placement." 28 C.F.R. § 541.25(a).  To the best of undersigned counsel's knowledge, no such order was ever provided to Mr. Young.  Undersigned counsel have not received such an order.

37.     In addition, when a "protection case" is placed in administrative segregation, he is entitled to "a hearing according to the requirements of 28 C.F.R. § 541.26(b) within seven calendar days of [his] placement [in administrative segregation]." 28 C.F.R. § 541.28.  Section 541.26(b) provides that "within seven continuous calendar days of your placement in either administrative detention or disciplinary segregation status, the [Segregation Review Official] will formally review your status *at a hearing you can attend*." 28 C.F.R. § 541.26(b) (emphasis added).  To the best of undersigned counsel's knowledge, Mr. Young has never been permitted to attend an administrative detention hearing since he was placed in solitary in the week after his arrest on August 3, 2016.  Nor have undersigned counsel been permitted to attend.

38.     As to mental health, the regulations provide that "[a]fter every 30 calendar days of continuous placement in either administrative detention or disciplinary segregation status, mental health staff will examine you, including a personal interview." 28 C.F.R. § 541.32.  Over 30 calendar days have elapsed since Mr. Young's placement in administrative segregation, but the ADC has not had mental health staff examine Mr. Young for mental health analysis.

39.     As to his physical health, the regulations required that "emergency medical care is always available." 28 C.F.R. § 541.32.  When Mr. Young bit off a portion of a tooth while grinding his teeth in a paroxysm of stress, ADC deputies informed Mr. Young he could not expect to receive medical assistance for several days.

40.     Undersigned counsel are in the process of engaging – and receiving Court approved expenses for – a clinical psychologist who will examine Mr. Young, in order to record his history of depression and perhaps other mental illness, as well as his current mental state in solitary confinement. *See Young*, 16-mj-355, ECF 23.  Undersigned counsel anticipate that the psychologist will assess Mr. Young at the ADC as early as Friday, September 23, 2016.

## C.     THE WRIT SHOULD BE GRANTED, AND MR. YOUNG RELEASED TO THE GENERAL POPULATION

41.     The restrictions placed on Mr. Young violate his protected liberty interest without due process of law; constitute pre-conviction punishment in violation of the Fifth Amendment, *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979); and, to the extent they are alleged to have been imposed for a legitimate institutional purpose, are not reasonably related thereto.  *Id.*

42.     Habeas corpus lies when a pre-trial detainee is placed under unconstitutional restraints during his otherwise lawful custody.  Accordingly, a § 2241 petition is the appropriate remedy for a prisoner seeking transfer from administrative segregation to the general population. *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973); *Boudin v. Thomas*, 732 F.2d 1107 (2d Cir.

1983); *David H. Brooks* v. *Duke Terrell, Warden, Met. Det. Ctr.*, 10-cv-4009, 2010 U.S. Dist.

LEXIS 144781 (E.D.N.Y. Oct. 14, 2010) (ordering move from administrative segregation to

general population, pursuant to 28 U.S.C. § 2241); *United States v. Basciano*, 369 F. Supp. 2d

344 (E.D.N.Y. 2005) (same).

## Exhaustion of Administrative Remedies

43.     Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought

with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

44.     As discussed above, Mr. Young is held at the Alexandria Detention Center, a

Virginia state detention facility that houses federal inmates in a contractual relationship with the

U.S. Marshals Service.  Accordingly, as the USMS' letter of September 16 itself indicates, it is

the ADC, not the USMS, that made the detainee classification decision to hold Mr. Young in

administrative segregation, and it is the ADC, not the USMS, that will periodically review that

decision.  Exh. 2.  As Sheriff Lawhorne indicated in a September 15 conversation with

undersigned counsel, ultimate authority at the ADC with respect to a detainee classification

decision lies with the Sheriff.  In the same conversation, the Sheriff indicated he is aware of no

administrative appeal of his detainee classification decisions at the ADC. *Supra*, para. 28.

45.     Accordingly, the letters and other communications between Mr. Young's counsel

and Sheriff Lawhorne, discussed *supra*, constitute the exhaustion of any administrative remedies

Mr. Young may have had.

46.     But even if some appeal of the Sheriff's decision did lie, of which the Sheriff

himself had no knowledge, the exhaustion requirement is prudential, not statutory, *Thompson v.*

*Wilson*, 15-cv-148, 2015 U.S. Dist. LEXIS 131006, at *7-8 (E.D. Va. Aug. 24, 2015); *Lopez v. Terrell*, 697 F.Supp.2d 549, 556 (S.D.N.Y. 2010), and may be excused at the court's discretion. *Zucker v. Menifee*, 03-cv-10077, 2004 WL 102779, at *4 (S.D.N.Y. Jan. 21, 2004); *Snyder v. Angelini*, 07-cv-3073, 2008 WL 4773142, at *2 (E.D.N.Y. 2008). As the *Lopez* court held, "Courts excuse failures to exhaust when '(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question.'" *Lopez*, 697 F.Supp.2d at 556 (*quoting Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003)) (internal quotations omitted).

47.     Here, even if some administrative appeal of the Sheriff's solitary confinement determination did lie, it should be excused because (1) the Sheriff misinformed Mr. Young and undersigned counsel about the availability of an appeal of his decision; (2) undersigned counsel requested that either the ADC or the USMS inform Mr. Young as to the availability of any administrative appeal of a custody determination at the Virginia-state run ADC, and neither of them provided such information (*compare* Exh. 1 *with* Exh. 2); and (3) irreparable injury may occur without immediate judicial relief inasmuch as Mr. Young's mental health is steadily deteriorating, with him telling undersigned counsel that he "could see himself dying soon in isolation," biting off a piece of one of his teeth in a paroxysm of stress, and being told that he would not receive medical attention for days afterward. In addition, there is a very real risk that the mental pressures of solitary confinement could coerce Mr. Young into pleading guilty to charges to which he may have meritorious defenses, albeit ones that will take time to develop. By the time any further administrative appeals are exhausted, this risk could easily be realized.

**Due Process Violations**

48.    "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 53 (1979); *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) ("The due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner; while the convicted prisoner is entitled to protection only against punishment that is 'cruel and unusual,' the pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to *any* form of 'punishment.'") (emphasis in original).

49.    Under *Wolfish* and *Martin*, pretrial confinement conditions run contrary to substantive due process when they are "(1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish *may be inferred*." *Martin*, 849 F.2d at 870 (*citing Wolfish*, 441 U.S. at 538-40) (emphasis added); *see also Boudin v. Thomas*, 533 F.Supp. 786, 788-89 (S.D.N.Y. 1982) ("[F]irst, the court must determine if the condition is specifically imposed for the purposes of punishment or for a legitimate governmental purpose; secondly, if evidence of punishment is lacking, this court must determine if the restriction is 'reasonably related' to a legitimate objective or *constitutes an exaggerated response*.") (emphasis added).

50.    Mr. Young has never been accused of, charged with, or convicted of any crime – much less a crime of violence – before the instant material-support-for-terrorism charge.  The material-support charge itself does not include any suggestion of violence, but instead only the allegation that Mr. Young provided $245 in Google Play gift cards to an individual he thought was his friend who had joined ISIL in Syria but who was in fact an FBI undercover agent.  *See United States v. Nicholas Young*, 16-mj-355 (E.D. Va. 2016), ECF 2.   Accordingly, there is no

factual foundation to support a finding that Mr. Young poses a threat to other inmates in the general population. 28 C.F.R. § 541.23(c). To the contrary, the press has reported that the FBI itself instructed the WMTA to *maintain* Mr. Young on the police force for years while he was being investigated. *See* http://wapo.st/2aPWdUx. Moreover, in the aforementioned September 15 conversation between undersigned counsel and Sheriff Lawhorne, the latter stated that the ADC's primary, or sole, justification for keeping Mr. Young in solitary was *not* a threat to the general population, but a risk to Mr. Young's own health and well-being. *Supra*, para. 28. The fact that the stated justifications of the ADC Sheriff and USMS for keeping Mr. Young in solitary are at odds with one another is a strong indication that the restriction at issue is not "reasonably related" to a legitimate objective. *Boudin*, 533 F.Supp. at 788-89.

     51.    As for the suggestion that Mr. Young is a "protective case" languishing in solitary for his own benefit, this is belied by several facts. First, over and above the well-documented psychological harm of solitary confinement inflicted on any detainee – *see, e.g., Basciano*, 369 F.Supp.2d at 352-53 ("[I]t is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee.") – Mr. Young has long suffered from depression.[3] This could well explain why solitary has had such an acutely negative effect on his mental state, which is growing worse by the day. As discussed, Mr. Young has informed his counsel that he believes he may die in solitary, and has bitten off a part of his tooth in a nervous fit. Against this very real and present harm to Mr. Young's health, the Sheriff has merely cited the speculative risk of "too much press" being generated by Mr. Young's case. *Supra*, p. 28.

---

[3] As discussed *supra*, undersigned counsel are in the process of engaging – and receiving Court approved expenses for – a clinical psychologist who will examine Mr. Young, in order to record his history of depression and perhaps other mental illness, as well as his current mental state in solitary confinement. Undersigned counsel anticipate that the psychologist will assess Mr. Young at the ADC as early as Friday, September 23, 2016.

Exactly how press coverage of his case relates to Mr. Young's safety in the general population has yet to be fully explained.

52.     Second, the suggestion that Mr. Young is in solitary for his own benefit is belied by his offer to the ADC and its officials to waive all legal claims against them that could arise from a move to the general population, and their rejection of the same. *Supra*, para. 28. Nor was the Sheriff or ADC willing to discuss the possibility of an indemnification of the ADC and its officials against the risk that the waiver somehow did not hold up in court (for reasons unexplained by the ADC).

53.     Numerous district court decisions support Mr. Young's position. In *David H. Brooks*, the court granted the writ and ordered the petitioner moved to the general population from administrative segregation. 2010 U.S. Dist. LEXIS 144781, at *35-36. There, the petitioner was held in isolation 23 hours per day in a cell approximately 8 by 6 feet – nearly the same as Mr. Young's restrictions (22 hours per day, in a cell 8 by 8 feet). *Id.*, at *1. Like Mr. Young, David H. Brooks had been charged with non-violent crimes and had no violent-crime history (in Mr. Brook's case, the charges were mail and wire fraud, securities fraud, and insider trading). *Id.*, at *2. As with Mr. Young, Mr. Books' placement in solitary was of indefinite duration. *Id.* To justify placing Mr. Brooks in administrative segregation, the government explained that he had previously been found smuggling drugs on two separate occasions, both times in pens hidden in a body cavity. *Id.*, at *26-27. Thus, Mr. Brooks was putatively being held in solitary confinement for his own safety and the safety of the general population. *Id.*

54.     The court rejected the government's arguments. "The question then is whether the means chosen to meet the objectives of [the detention center] – namely the indefinite and solitary confinement of Brooks – is reasonably related to the goal of preventing the type of

contraband at issue here from getting to the inmate population at the [detention center.]" *David H. Brooks*, 2010 U.S. Dist. LEXIS 144781, at *32. Mr. Brooks' mental instability, the indefinite nature of his placement in solitary, the non-violent nature of the charged crime, and the lack of any history of violence, all led the court to conclude that the means chosen – solitary – were not "reasonably related" to the detention center's objectives. *Id.*, at *35-36. All of the factors relied on by the *Brooks* court are present in Mr. Young's case.

55.    Another case in point is *Boudin v. Thomas*, 533 F.Supp. 786 (S.D.N.Y. 1982). There, Kathy Boudin was charged in the notorious 1981 Brinks robbery and murder case, in which it was alleged that she robbed an armored car with members of the terrorist groups the Weather Underground and the Black Liberation Army. 533 F. Supp. at 787. Just like Mr. Young, Ms. Boudin was held pretrial in nearly constant solitary confinement – *because of her alleged associations with terrorist groups alone. Id.*, at 790. As with Mr. Young, Ms. Boudin's pretrial solitary confinement was of an indefinite nature, and the security risk Ms. Boudin posed was not greater than that of many other inmates in the general population. In rejecting this terrorism justification, the court held:

> Administrative detention is intended as short-term housing, but the MCC has relegated Ms. Boudin to an indeterminate commitment there without adequate reasons. **The nature of her crime, her alleged but unsubstantiated affiliation with a terrorist organization is not sufficient cause to single out Ms. Boudin for the type of treatment she has received. Respondents are unable to present any other evidence necessitating the imposed conditions. The security risk posed by petitioner does not appear substantially greater than the risk posed by many other inmates housed at the MCC.** Nevertheless, the extent of the reaction of the federal prison system to this perceived risk is unwarranted in the circumstances presented by this case.

> *Boudin*, 533 F. Supp. at 791 (emphasis added).

56.    Yet another persuasive authority is *United States v. Basciano*, 369 F.Supp.2d 344 (E.D.N.Y. 2005).  There, the defendant was charged with numerous crimes, including murder, stemming from his position in the Bonnano crime family, yet the court concluded long term solitary confinement pending trial "was not reasonably related to [the detention center's] goal of preventing Basciano from continuing to plan or approve violent criminal conduct while in prison." 369 F.Supp. 2d at 351.  The court reasoned:

> In finding that the instant case does not present such circumstances, I in no way seek to diminish the seriousness of the allegations raised against Basciano or denigrate the government's interest in preventing individuals from furthering the activities of active criminal organizations while in pre-trial detention. However, on the record before me, I conclude that the government has not made a sufficient showing that Basciano was engaged in planning acts of violence while in pre-trial detention. Without that nexus to the institutional needs of the BOP [], there is little or nothing that distinguishes Mr. Basciano from the hundreds of individuals in pre-trial detention who are accused of having committed violent acts *before* they were detained.  Further, while the recordings clearly demonstrate Basciano's willingness to violate prison rules in order to communicate with other members of the Bonnano family, I find that those violations do not justify indefinite placement in administrative detention because the government has not linked these infractions to discrete criminal planning or conduct of any kind.

> *Id.* at 351 (footnote omitted).

57.    Significantly, in *Basciano* and *Boudin*, the pretrial detainees were charged with violent offenses, including murder, and had shown a "willingness to violate prison rules in order to communicate with other members of [a crime] family." *Basciano*, 369 F.Supp. 2d at 351.  In *Boudin*, the defendant was charged with robbery and murder, in addition to alleged associations with terrorist groups.  533 F. Supp. at 791.  Yet even these circumstances were deemed insufficient to justify solitary confinement.  It bears repeating that Mr. Young has *never* been so much as accused of a violent crime.

58.     In addition to the substantive due process protection against pretrial punishment described above, procedural due process concerns are raised when a pretrial detainee is placed in administrative segregation in a manner inconsistent with federal regulations. *See, e.g., Magluta v. Samples*, 375 F. 3d 1269 (11th Cir. 2004) (reversing dismissal of *Bivens* action based on procedural due process violation for pretrial solitary confinement that ran afoul of 28 C.F.R. § 541.22). As discussed above, 28 C.F.R. § 541.22 *et seq.* contain requirements of notice, hearings, periodic review, and health-related protections. These regulations create protected liberty interests for detainees. *Samples*, 375 F.3d at 1279. As explained *supra*, it appears that Mr. Young's regulatory protections to notice, a hearing which he may attend, and mental health care, have all been breached. *Supra*, pp. 12-14.

**The Increasing Public and Judicial Scrutiny of Administrative Segregation**

59.     Mr. Young's placement in administrative segregation stands at the confluence of two current trends in the U.S. federal prison system which are heading in divergent directions. In the narrow context of terrorism prosecutions, Mr. Young's solitary pretrial confinement is not at all unique. Human Rights Watch (HRW), among other civil liberties groups, has documented the post-9/11 reality that "the U.S. government frequently imposes solitary confinement on suspects in terrorism cases prior to trial." Illusion of Justice: Human Rights Abuses in US Terrorism Prosecutions, HUMAN RIGHTS WATCH, 2014, p. 112-114, available at http://bit.ly/2c0yAEG ("Illusion of Justice"). Such treatment "not only raises concerns of cruel and inhumane treatment or punishment, but it also has an impact on defendants' ability to assist in their own defense, and may compel them to waive their trial rights and accept plea deals." *Id.*, p. 112.

60.    Reviewing a sample of terrorism detainees held in pretrial solitary confinement, HRW concluded that "[i]n at least some cases [HRW] reviewed, the government's restrictions appear to have far exceeded what was necessary to address the stated security concerns." *Illusion of Justice*, p. 114.

61.    One pretrial detainee, Syed Hashemi, was held in solitary confinement for about three years in administrative segregation. *Illusion of Justice*, p. 113. The UN special rapporteur on torture, Juan Mendez, concluded that Hashmi's prolonged pretrial solitary confinement constituted a violation of his rights under the Convention against Torture "absent contrary evidence," which was not forthcoming from the U.S. government. *Id.*

62.    In another case, two pretrial detainees ultimately convicted of non-violent crimes, Adnan Mirza and Tarek Mehanna, were held in pretrial solitary confinement for more than two years. As with Mr. Young, they were told they were being held in solitary "for their own security." *Illusion of Justice*, p. 114. Human Rights Watch found it "hard to justify the severe restrictions on their human contact on [the stated security grounds]: it took three weeks for Mirza to receive mail from his family …. and he was allowed only a single 15-minute phone call to his family a month." *Id.*

63.    The Illusion of Justice report catalogues numerous instances where the emotional and psychological toll of solitary confinement impeded defendants' abilities to prepare for their defense or impaired their judgment – "even if the confinement was for days, rather than weeks or months." *Illusion of Justice*, p. 118.

64.    Yet, even as pretrial solitary confinement becomes routine in the terrorism context, the judicial pendulum has swung away from the use of administrative segregation in all other areas. As Justice Kennedy recently observed in *Davis v. Ayala*, 135 S. Ct. 2187, 2210

(2015), "[t]here are indications of a new and growing awareness in the broader public of the subject of corrections and of solitary confinement in particular." (*citing* Gonnerman, Before the Law, The New Yorker, Oct. 6, 2014, p. 26 (detailing multiyear solitary confinement of Kalief Browder, who was held — but never tried — for stealing a backpack); Schwirtz & Winerip, Man, Held at Rikers for 3 Years Without Trial, Kills Himself, N. Y. Times, June 9, 2015, p. A18.).  He added:

> [R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price. *See, e.g.,* Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U.J.L. & Pol'y 325 (2006) (common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors).
>
> \* \* \* \*
>
> In a case that presented the issue, the judiciary may be required, within its proper jurisdiction and authority, to determine whether workable alternatives for long-term confinement exist, and, if so, whether a correctional system should be required to adopt them.  Over 150 years ago, Dostoyevsky wrote, "The degree of civilization in a society can be judged by entering its prisons." There is truth to this in our own time.

> *Id.* at 2210.

**CONCLUSION**

65.     Mr. Young, who has never even been accused of a violent crime, is being held in nearly constant solitary confinement, to the sharp detriment of his mental health and of his ability to defend himself against the government's charges.  All of this is supposedly done for his own benefit.  Not according to Mr. Young's own assessment of what is in his interest, but in the judgment of the jail.  Which has refused to agree to any waiver by Mr. Young of claims he may theoretically raise against the jail for granting his wish to be released from isolation.  For all of the foregoing reasons, the Court should conclude that Mr. Young is presently confined under conditions that violate his statutory and constitutional rights.  The Court, therefore, should grant

the writ and order that Mr. Young be placed in the general population, provided his prescribed

insomnia medication, and given access to ADC inmate programs.

Dated:   September 21, 2016

DAVID B. SMITH PLLC

By:   _____

Nicholas D. Smith
VA Bar No. 79745 (inactive)
NY Bar No. 5058185
David B. Smith, PLLC
7 East 20th Street
New York, New York 10003
(917) 722-1096
*(pro hac vice* forthcoming)

_____

David B. Smith
VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street
Alexandria, Virginia 22314
(703) 548-8911
Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Nicholas Young*

25

Sheriff Dana Lawhorne
Re: Inmate Nicholas Young
September 6, 2016
Page 2


criminal complaint. *See* Affidavit in Support of Criminal Complaint, 16-mj-355, D.E. 2. The complaint does not allege that Mr. Young committed, or intended to commit, any act of terrorist violence. The sole criminal act alleged in the complaint is that of providing $245 in Google Play gift cards to an undercover agent. Moreover, the press has reported that the government itself instructed the Washington Metropolitan Transit Authority, where Mr. Young served as an officer for over thirteen years, to maintain Mr. Young on the force for years while he was being investigated.[1] Before the criminal complaint was filed in this case, Mr. Young had never been arrested for, charged with, or convicted of a crime. These facts undercut any concern that Mr. Young poses a security risk to the general inmate population.

For all of these reasons, I ask that you reconsider Mr. Young's placement in administrative segregation, and promptly notify me of your determination. But even if you do not move Mr. Young to the general inmate population, I respectfully request that you promptly inform me in writing: (a) as to the reasons why the ADC will not relocate Mr. Young to the general inmate population with any supporting factual foundation for the same, as well as the process by which an appeal of your decision may be exhausted; (b) when, how often, and in what manner the ADC will periodically review Mr. Young's placement in administrative segregation, in accordance with 28 C.F.R. § 541.22 and/or other regulatory or statutory authority; and (c) whether the ADC will promptly permit Mr. Young to receive his previously prescribed insomnia medication, and participate in ADC inmate programs, including those based on religious observance, and if not, the supporting reasons.

Thank you for your attention to these matters and for your prompt response.

Sincerely,

*Nicholas D. Smith*

Nicholas D. Smith

cc:    Gordon Kromberg
       Assistant U.S. Attorney
       *Gordon.Kromberg@usdoj.gov*

       Vincent T. O'Neal
       Supervisory Deputy U.S. Marshal
       *Vince.Oneal@usdoj.gov*

---

[1] *See* Police Officer for D.C. Subway System Accused of Trying to Help ISIS, WASHINGTON POST, Aug. 3, 2016, available at http://wapo.st/2aPWdUx.